**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-00585

TYLER GUNDERSON, derivatively on behalf of NEWMONT CORPORATION,

Plaintiff,

v.

THOMAS R. PALMER, NATASCHA VILJOEN, KARYN F. OVELMEN, PHILIP AIKEN, GREGORY H. BOYCE, BRUCE R. BROOK, MAURA J. CLARK, EMMA FITZGERALD, SALLY-ANNE LAYMAN, JOSÉ MANUEL MADERO, RENÉ MÉDORI, JANE NELSON, JULIO M. QUINTANA, and SUSAN STORY,

Defendants,

-and-

NEWMONT CORPORATION,

Nominal Defendant.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

---

Plaintiff Tyler Gunderson ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Newmont Corporation ("Newmont" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Thomas R. Palmer ("Palmer"), Natascha Viljoen ("Viljoen"), Karyn F. Ovelmen ("Ovelmen"), Philip Aiken ("Aiken"), Gregory H. Boyce ("Boyce"), Maura J. Clark ("Clark"), Emma Fitzgerald ("Fitzgerald"), Sally-Anne Layman ("Layman"), José Manuel Madero ("Madero"), René Médori ("Médori"), Jane Nelson ("Nelson"),

Julio M. Quintana ("Quintana"), and Susan Story ("Story") (collectively, the "Individual Defendants," and together with Newmont, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Newmont, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Schlorff and Baron for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Newmont, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Newmont's directors and officers from February 22, 2024 and October 23, 2024 (the "Relevant Period").

2. Newmont is one of the global leaders in gold mining, as well as the production of other metals such as copper, silver, zinc, and lead. The Company operates in mines across the world, with operations and assets throughout North America, Africa, Australia, Latin America and the Caribbean, and Papua New Guinea.

3. During the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements pertaining to the Company's financial guidance for the fiscal year ended December 31, 2024 (the "2024 Fiscal Year"). Specifically, the guidance was based upon the Company's ability to deliver higher qualities of gold production, in addition to its copper, silver, lead, zinc, and molybdenum production. The guidance was also based on the Company's ability to improve its mining operations and cost profile such that the Company can provide a consistent production volume, while incurring lower all-in sustaining costs at its Tier 1 facilities.

4. For example, on February 22, 2024, the Company issued a press release announcing its fourth quarter and year-end (the "FY 2023 Earnings Release") results for the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"). In discussing the Company's expectations in production and costs for 2024, the FY 2023 Earnings Release stated:

> Newmont's 2024 outlook is supported by steady production from Newmont's managed Tier 1 and Emerging Tier 1 assets, and is further enhanced by the Company's ownership in the Nevada Gold Mines and Pueblo Viejo joint ventures. These assets form the core of Newmont's 2024 attributable production outlook for the Tier 1 Portfolio of approximately 5.6 million ounces. Total Newmont gold production is expected to be 6.9 million ounces, incorporating the incremental 1.3 million ounces from the six non-core assets.
>
> Costs in 2024 are expected to remain in line with 2023, with CAS of approximately of $1,000 per ounce for the Tier 1 Portfolio. AISC for the Tier 1 Portfolio is expected to be approximately $1,300 per ounce in 2024, incorporating higher sustaining capital spend compared to the prior year.

5. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's Tier 1 operations facilities did not see the mining and cost profile improvements

expected; (2) as such, the Company did not have reliable information to be able to accurately predict its gold and mineral production levels; (3) as a result, the Company's revenue projections were not based upon reliable information; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

6. The truth emerged when, on October 23, 2024, the Company issued a press release announcing the financial and operational results from the third quarter of the 2024 Fiscal Year (the "Q3 2024 Earnings Release"). The Q3 2024 Earnings Release announced disappointing EBITDA results, as well as the revelation that there were decreases in production with simultaneous increases in costs. The Q3 2024 Earnings Release also revealed that the Company's two Tier 1 assets were also expected to see lower production and higher costs than originally expected.

7. On this news, the price of the Company's stock fell $8.49 per share, or approximately 14.7%, from a close of $57.74 per share on October 23, 2024, to close at $49.25 per share on October 24, 2024.

8. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

9. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

10. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Newmont to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between August 2024 and September 2024, approximately 3,782,250 shares of Newmont common stock were repurchased, costing the

Company approximately $197.7 million. As the Company's stock was actually worth only $49.25 per share, the price at which it was trading when markets closed on October 23, 2024, the Company overpaid for repurchases of its own stock ***by approximately $11.4 million in total***.

11. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while Defendant Palmer breached his fiduciary duties by engaging in improper insider sales, netting combined total proceeds of approximately $3.1 million.

12. In light of the Individual Defendants' misconduct, which has subjected Newmont, its President and Chief Executive Officer ("CEO"), its Chief Operating Officer ("COO"), and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Colorado (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the substantial likelihood of the directors' liability in this derivative action and of the Company's, the President and CEO's, the COO's, and the CFO's liability in the Securities Class Action, of their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Newmont's

Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14. his Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

19. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

20. Plaintiff is a current shareholder of Newmont common stock. Plaintiff has continuously held Newmont common stock since first purchasing it on January 22, 2024.

21. Plaintiff is a citizen of Montana.

**Nominal Defendant Newmont**

22. Newmont is a Delaware corporation with its principal executive offices at 6900 E. Layton Avenue, Denver, Colorado 80237. Newmont's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "NEM."

**Defendant Palmer**

23. Defendant Palmer has served as the Company's President and CEO since October 2019. He has been with the Company since May 2016 in various roles, most recently serving as the Company's President until his promotion to CEO.

24. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Palmer made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| August 1, 2024 | 20,000 | $49.51 | $990,260 |
| September 3, 2024 | 20,000 | $52.47 | $1,049,400 |
| October 1, 2024 | 20,000 | $53.81 | $1,076,200 |

Thus, in total, before the fraud was exposed, Defendant Palmer sold 60,000 shares of Company stock on inside information, for which he received approximately $3.1 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material

misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

25. According to the Schedule 14A the Company filed with the SEC on March 11, 2024 (the "2024 Proxy Statement") stated the following about Defendant Palmer:

> Tom Palmer, 56, is President and Chief Executive Officer and joined Newmont's Board of Directors on October 1, 2019. Mr. Palmer served as President since June 2019 and as President and Chief Operating Officer from November 2018 until June 2019. Previously, he served as Executive Vice President and Chief Operating Officer since May 2016. Mr. Palmer was elected Senior Vice President, Asia Pacific in February 2015 after serving as Senior Vice President, Indonesia since March 2014. Mr. Palmer holds a Bachelor of Science degree in Engineering from Monash University and a Master of Science in Engineering from Monash University in Melbourne, Australia.

26. Upon information and belief, Defendant Palmer is a citizen of Colorado.

**Defendant Viljoen**

27. Defendant Viljoen has served as the Company's COO since October 2023.

28. The 2024 Proxy Statement stated the following about Defendant Viljoen:

> As Chief Operating Officer (COO), Ms. Viljoen serves as a member of Newmont's executive leadership team that sets the strategic direction for the Company. As of year-end 2023, Ms. Viljoen was responsible for leading the mine operations in Australia, Latin America and Caribbean, North America, and Papua New Guinea, as well as overseeing Global Projects.
>
> **Profile:** Ms. Viljoen joined Newmont as Chief Operating Officer on October 2, 2023, bringing over 30 years of experience across a diverse range of commodity businesses. After an onboarding period, Ms. Viljoen initially assumed accountability for the Company's Australia and North America business units and the newly acquired Papua New Guinea business unit in November 2023. In addition, she oversaw critical activities associated with incorporating Newcrest's people and assets into Newmont upon the implementation of the Newcrest acquisition. Following a transition period with Mr. Atkinson, Ms. Viljoen assumed additional responsibility with full accountability for the Africa, Peru, and Latin America & Caribbean (formally South America) business units, as well as Global Projects. In 2024, Ms. Viljoen will become Newmont's sole Chief Operating Officer.

Prior to joining Newmont, Ms. Viljoen served as the CEO of Anglo American's platinum business in South Africa since 2020, the world's largest primary producer of platinum. At Anglo American, she was responsible for managing a team of more than 25,000 employees and six owned and joint venture mining operations with an integrated value chain and down-stream processing across two countries. Prior to her CEO appointment, Ms. Viljoen held a series of operating and technical positions within the organization, including as Group Head of Processing. Prior to joining Anglo American, Natascha spent six years at Lonmin, where she served on the executive committee as Executive Vice President of Processing, also with responsibility for several wider corporate functions, including sustainability. She is a metallurgical engineer and holds a Bachelor of Engineering from North West University in South Africa and an Executive MBA from the University of Cape Town, South Africa.

29. Upon information and belief, Defendant Viljoen is a citizen of Colorado.

**Defendant Ovelmen**

30. Defendant Ovelmen has served as the Company's CFO since May 2023.

31. The 2024 Proxy Statement stated the following about Defendant Ovelmen:

As Chief Financial Officer, Ms. Ovelmen serves as a member of Newmont's executive leadership team that sets the strategic direction for the Company. Ms. Ovelmen leads the Company's financial planning and analysis, accounting, controller, tax, treasury, and internal audit functions, as well as oversees investor relations and enterprise risk management.

**Profile:** Ms. Ovelmen joined Newmont in May of 2023 and is a highly experienced financial professional, responsible for maintaining a robust and flexible balance sheet to support Newmont's capital allocation strategy and oversees Newmont's global finance function. Ms. Ovelmen brings extensive global leadership experience to the role, having previously held Chief Financial Officer roles for highly complex and capital intensive companies in the resource and energy sectors, including Flowserve, LyondellBassell Industries NV, and Petroplus Holdings AG. Most recently, Ms. Ovelmen had been fully dedicated to Board of Director roles at Hess Corporation and Arcelor Mittal. She has a strong commitment to developing high performing teams, continuous improvement, and performance in global organizations having worked in the United States and the United Kingdom. She holds a Bachelor of Arts in Political Science from the University of Connecticut and is a licensed Certified Public Accountant in the state of Texas.

32. Upon information and belief, Defendant Ovelmen is a citizen of Colorado.

**Defendant Aiken**

33. Defendant Aiken has served as a Company director since November 2023. He also serves as a member of the Leadership Development and Compensation Committee (the "Compensation Committee").

34. The 2024 Proxy Statement stated the following about Defendant Aiken:

> Philip Aiken AM, 75, retired from BHP Billiton where he was Group President Energy and President BHP Petroleum from 1997 to 2006. Other notable executive roles include his tenure as Regional Director BOC Gases Europe, Regional Director BOC Gases South Pacific, Managing Director of CIG and Chief Executive of BTR-Nylex. Non-Executive roles have included Chairman of Aveva plc, Balfour Beatty plc, Robert Walters plc, and Non-Executive Director of National Grid plc, Kazakymys plc and Essar Energy plc. Mr. Aiken was also a Senior Advisor of Macquarie Bank (Europe), Director of Miclyn Express Offshore and Essar Oil (India) and Chairman of the 2004 World Energy Congress. He has served on the Boards of the Governor of Guangdong International Council, World Energy Council and Monash Mt Eliza Business School. Mr. Aiken holds a Bachelor of Engineering from the University of Sydney and attended the Advanced Management Program at Harvard Business School in 1989.

35. Upon information and belief, Defendant Aiken is a citizen of Australia.

**Defendant Boyce**

36. Defendant Boyce has served as a Company director since October 2015, and as the Independent Chair of the Board since 2021. He also serves as the Chair of the Corporate Governance and Nominating Committee, the Chair of the Executive-Finance Committee, and a member of the Compensation Committee.

37. The 2024 Proxy Statement stated the following about Defendant Boyce:

> Gregory H. Boyce, 69, retired from Peabody Energy Corporation in 2015 as Executive Chairman and Chief Executive Officer. Mr. Boyce joined Peabody in 2003 as President and Chief Operating Officer and served as Chief Executive Officer from 2006 to 2015. Prior to joining Peabody, Mr. Boyce served as Chief Executive Officer — Energy for international mining company Rio Tinto in London, and other various executive roles with Rio Tinto Group from 1989 to 2003. Mr. Boyce holds a Bachelor of Science in Mining Engineering from the University of Arizona and an Advanced Management Program degree from Harvard University's Graduate School of Business.

38. Upon information and belief, Defendant Boyce is a citizen of Arizona.

**Defendant Brook**

39. Defendant Brook has served as a Company director since October 2011. He also serves as the Chair of the Audit Committee and as a member of the Corporate Governance and Nominating Committee and the Executive-Finance Committee.

40. The 2024 Proxy Statement stated the following about Defendant Brook:

> Bruce R. Brook, 68, retired from WMC Resources Limited in 2005 where he was Chief Financial Officer. Mr. Brook also held key executive roles including Deputy Chief Finance Officer of ANZ Banking Group Limited, Group Chief Accountant of Pacific Dunlop Limited and General Manager, Group Accounting positions at CRA Limited and Pasminco Limited. Mr. Brook has extensive board, Audit Committee and executive leadership experience in diverse industries, including mining, finance, manufacturing and chemicals. Mr. Brook holds a Bachelor of Commerce and Accounting from University of the Witwatersrand. Mr. Brook is also a Fellow of the Institute of Accountants in Australia and New Zealand and is a member of the Australian Institute of Company Directors.

41. Upon information and belief, Defendant Brook is a citizen of Australia.

**Defendant Clark**

42. Defendant Clark has served as a Company director since April 2020. She also serves as a member of the Compensation Committee.

43. The 2024 Proxy Statement stated the following about Defendant Clark:

> Maura J. Clark, 65, retired from Direct Energy, a subsidiary of Centrica plc, in March 2014 where she was President of Direct Energy Business, a leading energy retailer in Canada and the United States. Previously, Ms. Clark was Executive Vice President of North American Strategy and Mergers and Acquisitions for Direct Energy. Ms. Clark's prior experience includes investment banking and serving as Chief Financial Officer of an independent oil refining and marketing company. Ms. Clark has extensive board, Audit Committee, strategic finance and executive leadership experience. Ms. Clark holds a Bachelor of Arts in Economics from Queen's University. She is a member of the Association of Chartered Professional Accountants of Ontario.

44. Upon information and belief, Defendant Clark is a citizen of New York.

**Defendant Fitzgerald**

45. Defendant Fitzgerald has served as a Company director since December 2021. She also serves as a member of the Safety and Sustainability Committee.

46. The 2024 Proxy Statement stated the following about Defendant Fitzgerald:

> Dr. Emma FitzGerald, 57, retired from Puma Energy International, a global energy business, focused on delivering energy solutions in Central America, Africa and Asia, in 2021 as Chief Executive Officer and Executive Director. Prior to joining Puma Energy, Dr. FitzGerald served as Executive Director of Severn Trent plc, a UK water & waste services business, from 2015 to 2018. From 2013 to 2015 she served as Chief Executive Officer of gas distribution at National Grid plc, a UK utility, and prior to that she spent over 20 years with Royal Dutch Shell in various senior leadership roles in the Downstream businesses. Currently Independent Non-Executive Director of Seplat Energy plc and UPM Kymmene oyj. Dr. FitzGerald holds a Master of Business Administration from Manchester Business School, and a Doctor of Philosophy in Surface Chemistry from Balliol College, Oxford University and Advanced Certificate in Executive Coaching.

47. Upon information and belief, Defendant Fitzgerald is a citizen of the United Kingdom.

**Defendant Layman**

48. Defendant Layman has served as a Company director since November 2023. She also serves as a member of the Safety and Sustainability Committee.

49. The 2024 Proxy Statement stated the following about Defendant Layman:

> Sally-Anne Layman, 50, retired from Macquarie Group Limited where she was Division Director and Joint Head of the Perth office of the Metals, Mining & Agriculture Division. Prior to that, Ms. Layman was a Mining Engineer at Mount Isa Mines, Production Engineer and Alternate Underground Manager at Great Central mines, Accountant at Normandy Yandal, and Management Accountant at Western Metals Limited. Ms. Layman holds a Bachelor of Engineering in Mining with Honors from Curtin University, a Bachelor of Commerce from the University of Southern Queensland, a First Class Mine Managers Certificate of Competency from the WA Department of Mines and Petroleum and she is a Certified Practicing Accountant.

50. Upon information and belief, Defendant Layman is a citizen of Australia.

**Defendant Madero**

51. Defendant Madero has served as a Company director since April 2021. He also serves as a member of the Safety and Sustainability Committee.

52. The 2024 Proxy Statement stated the following about Defendant Madero:

> José Manuel Madero, 55, is the Founder and Managing Partner of Bizwp SC, a consulting firm with a strong focus on advising companies in increasing Social/Financial Profitability based out of Mexico City. From 2015 to 2019, Mr. Madero served as Chief Executive Officer at Grupo Bepensa, a Mexican business conglomerate comprised of 40 companies across the industrial, automotive, financial services, and non-alcoholic and alcoholic beverage sectors and from 2005 to 2015, Mr. Madero held various senior management positions at Monsanto Company. Mr. Madero holds a Bachelor of Science in Mine Engineering from the Colorado School of Mines and a Master of Business Administration in Entrepreneurship and International Business Finance from FW Ollin Graduate School of Business at Babson College.

53. Upon information and belief, Defendant Madero is a citizen of Mexico.

**Defendant Médori**

54. Defendant Médori has served as a Company director since April 2018. He also serves as a member of the Audit Committee.

55. The 2024 Proxy Statement stated the following about Defendant Médori:

> René Médori, 66, retired from Anglo American plc in 2018 where he was Finance Director since 2005. Until 2017, Mr. Médori was a non-executive director of De Beers and Anglo-American Platinum Limited. He was a non-executive director of SSE plc until December 2017 and Cobham plc until January 2020. Mr. Médori holds a doctorate in economics and degrees in finance and economics from the Université de Paris-Dauphine, France, and completed the Financial Management Program at the Graduate School of Business, Stanford University.

56. Upon information and belief, Defendant Médori is a citizen of the United Kingdom.

**Defendant Nelson**

57. Defendant Nelson has served as a Company director since October 2011. She also serves as Chair of the Safety and Sustainability Committee and as a member of the Corporate Governance and Nominating Committee.

58. The 2024 Proxy Statement stated the following about Defendant Nelson:

> Jane Nelson, 63, is Founding Director of the Corporate Responsibility Initiative at Harvard Kennedy School, and a nonresident senior fellow at the Global Economy and Development Program at the Brookings Institution. From 1993 to 2009, Ms. Nelson was a Director at the International Business Leaders Forum, and a senior advisor until 2013. Ms. Nelson is a former Senior Associate at the Institute for Sustainability Leadership, University of Cambridge and has served on advisory committees to over 45 global corporations, non-governmental organizations and government bodies since 1992. Ms. Nelson holds a Master of Arts and Bachelor of Arts in Philosophy in Politics and Economics from the University of Oxford and a Bachelor of Science in Agriculture with a major in Economics (cum laude) from the University of Natal (now University of KwaZulu-Natal), South Africa, and is a former Rhodes Scholar.

59. Upon information and belief, Defendant Nelson is a citizen of Massachusetts.

**<u>Defendant Quintana</u>**

60. Defendant Quintana has served as a Company director since October 2015. He also serves as Chair of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee.

61. The 2024 Proxy Statement stated the following about Defendant Quintana:

> Julio M. Quintana, 64, retired from Tesco Corporation in 2014 as President and Chief Executive Officer and as a Director from September 2004 to May 2015. From 2004 to 2005, Mr. Quintana served as Tesco's Executive Vice President and Chief Operating Officer. From 1999 to 2004, Mr. Quintana served in various executive roles for Schlumberger Technology Corporation. Prior to joining Schlumberger, Mr. Quintana spent nearly 20 years in the oil and gas exploration and production business in various operational roles for Unocal Corporation. Mr. Quintana holds a Bachelor of Science degree in Mechanical Engineering from the University of Southern California, Los Angeles and is a licensed professional petroleum engineer in the State of California.

62. Upon information and belief, Defendant Quintana is a citizen of Texas.

**Defendant Story**

63. Defendant Story has served as a Company director since September 2020. She also serves as a member of the Audit Committee.

64. The 2024 Proxy Statement stated the following about Defendant Story:

> Susan N. Story, 64, retired from American Water Works Company, Inc. in 2020 as President and Chief Executive Officer. She joined American Water as Senior Vice President and Chief Financial Officer in 2013. Prior to joining American Water, Ms. Story served as Executive Vice President of Southern Company, and in other executive positions with subsidiaries of Southern, including President and Chief Executive Officer of Southern Company Services from 2011 to 2013 and President of Gulf Power Company from 2003 to 2010. Ms. Story holds a Bachelor of Science in Industrial Engineering from Auburn University and a Master of Business Administration from the University of Alabama at Birmingham.

65. Upon information and belief, Defendant Story is a citizen of New Jersey.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

66. By reason of their positions as officers, directors, and/or fiduciaries of Newmont and because of their ability to control the business and corporate affairs of Newmont, the Individual Defendants owed Newmont and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Newmont in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Newmont and its shareholders so as to benefit all shareholders equally.

67. Each director and officer of the Company owes to Newmont and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

68. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Newmont, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

69. To discharge their duties, the officers and directors of Newmont were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Newmont, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Newmont's Board at all relevant times.

71. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to

disclose omissions of material fact in its regulatory filings with the SEC and all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

72. To discharge their duties, the officers and directors of Newmont were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Newmont were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Colorado, and the United States, and pursuant to Newmont's own Code of Conduct ("Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Newmont conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Newmont and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Newmont's operations would comply with all

applicable laws and Newmont's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

73. Each of the Individual Defendants further owed to Newmont and the shareholders the duty of loyalty requiring that each favor Newmont's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

74. At all times relevant hereto, the Individual Defendants were the agents of each other and of Newmont and were at all times acting within the course and scope of such agency.

75. Because of their advisory, executive, managerial, and directorial positions with Newmont, each of the Individual Defendants had access to adverse, non-public information about the Company.

76. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Newmont.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

77. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

78. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement waste of corporate assets, abuse of control, and violations of Sections 14(a), 10(b), 20(a), and 21D of the Exchange Act.

79. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Newmont, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

80. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

81. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Newmont and was at all times acting within the course and scope of such agency.

## NEWMONT'S CODE OF CONDUCT

82. The Company's Code of Conduct begins by stating that it "sets out threshold expectations of behavior for Newmont employees, officers and directors, and for our business partners, vendors and contractors when they are working with us or on our behalf." The Code of Conduct also states that the Company's "expectation is that every employee and every contractor engaged on our behalf is individually accountable for our reputation for integrity."

83. In a section titled "We work honestly and in the best interests of Newmont," the Code of Conduct states the following:

> We are truthful in our work-related interactions, whether in explaining a problem to our supervisor or in reporting results. We will not let gifts or entertainment improperly influence decisions related to Newmont. We avoid situations where Newmont's interests and our own interests conflict, or even appear to be inconsistent. We do not take personal advantage of opportunities that we discover through our work for Newmont, and we do not use Newmont property or information for our own or our family members' or friends' gain. We recognize that our behavior away from the workplace can impact Newmont and our employment, and we will be held accountable for such behavior in accordance with local laws. We also will report all legal charges (including traffic violations if we operate a vehicle for the company) or convictions to our supervisors and the Human Resources department in a timely manner. Please see our Business Integrity Policy and our People Policy for more on these topics.

84. In a section titled "We behave honestly in the marketplace," the Code of Conduct states:

> We will not trade in Newmont stock or the stock of any other company based on material information that has not been disclosed to the public, and we will not

> disclose such information to others so that they may trade based on it. Please see our Business Integrity Policy for more on this topic.

85. In a section titled "We are accountable for upholding the Code," the Code of Conduct states:

> Every Newmont employee, officer, director, partner, vendor, and contractor engaged on behalf of the company is accountable for complying with Newmont's Code, Policies, Standards, Procedures, and Guidelines, and all local and national laws, and applicable regulations in all countries where Newmont does business. Failure to live up to the responsibilities in our Code, Policies, Standards, Procedures, Guidelines or applicable laws and regulations may result in disciplinary action, up to and including termination of employment. Please see our People Policy for more on this topic.

86. In a section titled "Waiver," the Code of Conduct states:

> This Code cannot be waived without appropriate approval. If you encounter a situation that you believe may require waiver of a provision of the Code, raise the issue promptly with your manager, your regional Site Compliance Manager or Integrity Advocate, or through a submission to the Integrity Helpline. Directors and executive officers who seek a waiver should address the Board of Directors or a designated committee of the Board. Waivers for Directors and executive officers will be disclosed to the extent and in the manner required by law, regulation, or stock exchange listing standard.

87. The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## NEWMONT'S AUDIT COMMITTEE CHARTER

88. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). In a section titled "Purpose and Responsibilities," the Audit Committee Charter states the following, in relevant part:

> The primary responsibility for financial and other reporting, internal controls, and compliance with laws and regulations, and ethics rests with the management of the Corporation. The Committee's primary purposes are (1) to assist the Board in its oversight of the integrity of the Corporation's financial statements, the Corporation's compliance with legal and regulatory requirements and corporate policies and controls, the independent public accountant's selection, retention, qualifications, objectivity and independence, and the performance of the Corporation's internal audit function, and (2) to prepare the "Report of the Audit Committee" to be included in the Corporation's annual proxy statement.
>
> The Committee shall maintain free and open communication between itself, and each of the independent public accounting firm, the principal accounting officer, senior management, the lead executives of internal audit and reserves reporting and the Board. The Committee shall arrange for each of the foregoing to meet with the entire Board as it deems appropriate. The independent public accounting firm shall report directly to the Committee.
>
> The Committee shall meet at least four times each year and at such other times as it deems necessary to fulfill its responsibilities. The Committee shall meet with the principal accounting officer, senior management, the lead executives of internal audit and the independent public accounting firm in separate executive sessions at least four times each year and at such other times as it deems necessary to discuss matters for which the Committee has responsibility.

89. In a section titled "Specific Duties," under the subheading "Oversight of Independent Public Accounting Firm," the Audit Committee Charter listed the following responsibilities of the Audit Committee:

> 1. Be directly responsible for the appointment, compensation, retention and oversight of the work of the Corporation's independent public accounting firm, including by retaining, evaluating and, where appropriate, terminating the engagement of the Corporation's independent public accounting firm.
>
> 2. At least annually, obtain and review a written report by the independent public accounting firm describing (i) the firm's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, peer

> review or Public Company Accounting Oversight Board review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, with respect to any independent audit carried out by the firm, and any steps taken to deal with any such issues; and (iii) all relationships between the firm and the Corporation. After reviewing the foregoing report and the independent public accounting firm's work throughout the year, the Committee shall evaluate the firm's qualifications, performance and independence. This evaluation should include the review and evaluation of the lead audit partner and take into account the opinions of management and the Corporation's personnel responsible for the internal audit function.
>
> 3. Take such action as necessary to assure the rotation of the engagement audit partner at least every five years or such other period as may be required under applicable law. The Committee shall consider whether, in order to assure continuing independence of the independent public accounting firm, there should be regular rotation of the independent public accounting firm itself.
>
> 4. Pre-approve (i) all auditing services and related fees and the terms thereof, including the scope of the independent public accounting firm's audit examination plan, procedures and timing of the audit and (ii) any non-audit services (i.e., any services provided other than in connection with the audit or review of financial statements) to be rendered by the independent public accounting firm, including the terms thereof, and the fees to be paid in connection therewith, in each case to the extent permitted by applicable regulations, it being understood that (a) the Committee may delegate to one or more members of the Committee the authority to pre-approve services to be provided by the independent public accounting firm and (b) any such pre-approval by one or more members of the Committee shall be reported to the full Committee at the next scheduled meeting. The pre-approval of auditing and non-auditing services can be done with input from, but no delegation of authority to, management.
>
> 5. Review hiring policies for employees or former employees of the independent public accounting firm in accordance with applicable laws and regulations.
>
> 6. Resolve disagreements, if any, between the independent public accounting firm and management.

90. With respect to "Financial Reporting Matters," the Audit Committee Charter states the following:

> 1. Review with management and the independent public accounting firm risks of material misstatement due to fraud, and the processes and controls implemented by the Corporation to manage the risks.

2. Review with management and the independent public accounting firm the accounting and reporting principles and practices applied by the Corporation in preparing its financial statements, including: (i) major issues regarding accounting principles and financial statement presentations including any significant changes in the Corporation's selection or application of accounting principles, and major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies; (ii) analyses prepared by management and/or the independent public accounting firm setting forth significant financial reporting issues, estimates and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Corporation; and (iv) earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

3. Discuss with management generally the types of information (including financial information and earnings guidance) to be disclosed in earnings press releases and earnings calls, as well as to analysts and rating agencies.

4. Prior to the release of each quarterly and annual earnings news release, discuss with management and the independent public accounting firm the results for the quarter or the year, including any significant transactions which occurred during the quarter or the year, any significant adjustments, management judgments and accounting estimates, new accounting policies and any disagreements between management and the independent public accounting firm.

5. Prior to each annual news release reporting proven and probable reserves, review with the director of reserves reporting the Corporation's policies, procedures and methodology regarding the reporting of proven and probable reserves and non-reserve mineralized material.

6. Prior to the release of the annual financial statements and Annual Report on Form 10-K, meet to review and discuss with management and the independent public accounting firm, upon completion of its audit, the financial results for the year and the results of the audit, including (i) the Corporation's annual financial statements and related footnotes; (ii) management's discussion and analysis of the financial condition and results of operations; (iii) the results of the audit, including the nature and amount of unrecorded adjustments resulting from the audit; (iv) the independent public accounting firm's management recommendations; (v) any significant transactions which occurred during the year; (vi) any significant adjustments; (vii) management judgments and accounting estimates; (viii) new accounting policies; (ix) all alternative treatments of financial information within generally accepted accounting principles, ramifications of the use of alternative disclosures and treatments, and the treatment preferred by the independent public

> accounting firm; and (x) any disagreements between management and the independent public accounting firm.
>
> 7. Prior to the release of quarterly financial statements and Quarterly Report on Form 10-Q, meet to review and discuss with management and the independent public accounting firm, the Corporation's quarterly financial statements for such quarter, including (i) the financial statements and related footnotes; (ii) management's discussion and analysis of the financial condition and results of operations; (iii) the result of the quarterly review, including the nature and amount of unrecorded adjustments resulting from the review; (iv) any significant transactions which occurred during the quarter; (v) any significant adjustments; (vi) critical accounting policies and practices; (vii) new accounting policies; (viii) all alternative treatments of financial information within generally accepted accounting principles, ramifications of the use of alternative disclosures and treatments, and the treatment preferred by the independent public accounting firm; and (ix) any disagreements between management and the independent public accounting firm.
>
> 8. At least quarterly, review with the independent public accounting firm difficulties or problems encountered in the course of any audit work and management's response thereto, including any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.
>
> 9. Prepare the "Report of the Audit Committee" included in the Corporation's annual proxy statement.
>
> 10. Based on the Committee's review and discussion, recommend to the Board whether the audited financial statements should be included in the Annual Report on Form 10-K.

91. Regarding "Internal Audit and Internal Control Matters," the Audit Committee Charter states:

> 1. Review with the director of internal audit the responsibilities, qualifications and staffing of the internal audit department, the budget and scope of the audits, any significant findings and management's response thereto. Review the appointment, performance and replacement of the director of internal audit.
>
> 2. Review with the independent public accounting firm, the director of internal audit and management the Corporation's policies and procedures relative to the adequacy and effectiveness of internal accounting and financial reporting controls (including any significant deficiencies and significant changes in internal control over financial reporting), including controls over quarterly and annual financial reporting, computerized information systems and cybersecurity.

> 3. Review and evaluate the internal auditors' work throughout the year, taking into account the opinions of management and internal audit personnel, and present the Committee's conclusions to the full Board.

92. Regarding "Compliance and Risk Management Matters," the Audit Committee Charter states:

> 1. Discuss with management, the independent public accounting firm and the internal auditors the Corporation's policies, procedures and programs regarding compliance with established standards of corporate conduct and applicable laws and regulations.
>
> 2. Review with management, the director of internal audit and the independent public accounting firm (i) the Corporation's policies with respect to risk assessment and risk management; (ii) the Corporation's major financial risk exposures; (iii) the steps management has taken to monitor and control such exposures; and (iv) the processes followed for assessment of internal controls over financial reporting. This review will include risks related to the Corporation's financial statements, legal and regulatory compliance matters, the oversight of the independent public accounting firm and the performance of the internal audit function.
>
> 3. Ensure the implementation of procedures for the receipt, retention and treatment of complaints regarding accounting, internal controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.
>
> 4. Confer with the Corporation's General Counsel or Chief Compliance Officer as requested by the General Counsel, Chief Compliance Officer or by the Committee, at least annually, and review the reports with respect to the Corporation's programs for compliance with legal and regulatory requirements.
>
> 5. Review and discuss any reports addressed to the Committee or any member of the Committee received from attorneys regarding securities law violations and/or breaches of fiduciary duties or similar violations which were reported to executive management and not resolved to the satisfaction of the reporting attorney.
>
> 6. Review and approve related-party transactions, if any, required to be disclosed according to SEC Regulation S-K Item 404 and in accordance with the Corporation's policies and procedures related to related-party transactions, and discuss with management the business rationale for the transactions and whether appropriate disclosures have been made.

7. Review the results of reviews of executive officers' expense accounts and use of corporate assets.

93. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by issuing materially false and misleading statements to the investing public, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures and failing to adequately oversee the Company's disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

94. Newmont was originally incorporated in 1921 and has since grown to become a global leader in gold mining and copper, silver, zinc, and lead production. The Company operates throughout North America, Africa, Australia, Latin American and the Caribbean, and Papua New Guinea.

95. As of December 31, 2023, Newmont had attributable proven and probable gold reserves of 135.9 million ounces, attributable measured and indicated gold resources of 104.8 million ounces, and attributable inferred gold resources of 69.1 million ounces.

## FALSE AND MISLEADING STATEMENTS

### *February 22, 2024 Press Release*

96. On February 22, 2024, the Company issued the FY 2023 Earnings Release announcing the financial and operational results for the fourth quarter and year-end of the 2023 Fiscal Year. Regarding the results, the FY 2023 Earnings Release revealed:

> • Completed the acquisition of Newcrest Mining Limited on November 6, 2023, creating the world's leading gold company with robust copper optionality
>
> • Delivered $1.4 billion in dividends to shareholders in 2023
>
> • Produced 5.5 million gold ounces and 891 thousand gold equivalent ounces (GEOs) from copper, silver, lead and zinc; in-line with revised guidance range and incorporating the legacy Newcrest assets from the acquisition close date
>
> • Reported gold Costs Applicable to Sales (CAS) per ounce of $1,050 and gold All-In Sustaining Costs (AISC) per ounce of $1,444; in-line with revised guidance range and incorporating higher sustaining capital spend for 2023
>
> • Generated $2.8 billion of cash from continuing operations and reported $88 million in Free Cash Flow3 after unfavorable working capital changes of $513 million and $2.7 billion of reinvestment to sustain current operations and advance near-term projects
>
> • Reported Net Loss of $2.5 billion driven by $1.9 billion in impairment charges, $1.5 billion in reclamation charges and $464 million in Newcrest transaction and integration costs; these items are excluded from adjusted earnings results
>
> • Adjusted Net Income (ANI) of $1.61 per share and Adjusted EBITDA of $4.2 billion for the full year; fourth quarter ANI was $0.50 per share
>
> • Declared increased total Newmont reserves of 136 million gold ounces and resources of 174 million gold ounces; significant upside to other metals, including copper, silver, lead and zinc

97. Regarding the Company's guidance for the upcoming 2024 Fiscal Year, the FY 2023 Earnings Release stated:

> Newmont's 2024 outlook is supported by steady production from Newmont's managed Tier 1 and Emerging Tier 1 assets, and is further enhanced by the Company's ownership in the Nevada Gold Mines and Pueblo Viejo joint ventures. These assets form the core of Newmont's 2024 attributable production outlook for the Tier 1 Portfolio of approximately 5.6 million ounces. Total Newmont gold production is expected to be 6.9 million ounces, incorporating the incremental 1.3 million ounces from the six non-core assets.
>
> Costs in 2024 are expected to remain in line with 2023, with CAS of approximately of $1,000 per ounce for the Tier 1 Portfolio. AISC for the Tier 1 Portfolio is expected to be approximately $1,300 per ounce in 2024, incorporating higher sustaining capital spend compared to the prior year.

98. The FY 2023 Earnings Release also quoted Defendant Palmer, who highlighted the 2023 results while expanding on the expectations for 2024:

> 2023 was a transformational year for Newmont, and for all of our stakeholders…With the acquisition of Newcrest now complete, our principal focus for 2024 is to integrate and transform our leading portfolio of Tier 1 assets into a unique collection of the world's best gold and copper operations and projects. With stable production and structured reinvestment throughout the year, we are strongly positioned to deliver on our commitments in 2024 and set the stage for meaningful growth in 2025 and beyond.

***February 22, 2024 Earnings Call***

99. That same day, the Company hosted an earnings call with investors and analysts to discuss the fourth quarter and year-end results (the "FY 2023 Earnings Call"). During his scripted remarks on the FY 2023 Earnings Call, Defendant Palmer discussed the rationale behind the Company's 2024 guidance, stating:

> When we announced our binding agreement to acquire Newcrest in May last year, we outlined a powerful value proposition built around 4 key commitments: first, to set the new sustainability standard and strengthen Newmont's position as the gold sector's recognized sustainability leader; second, to create the industry's strongest portfolio of world-class gold and copper assets in the most favorable mining jurisdictions; third, to deliver $500 million of annual synergies and realize over $2 billion in cash from portfolio optimization; and finally, to continue driving a disciplined, balanced approach to capital allocation.
>
> After closing the transaction on November 6 last year, the integration of the 5 new operations into our Newmont operating model has been progressing very well. And as we enter this critically important year of integration and transformation, I'll be holding myself and my executive leadership team accountable for delivering on these commitments. And this will be our key focus for 2024.

100. Defendant Palmer continued on, outlining the steps taken to enhance the Company's 2024:

> To support this work, earlier today, we announced 4 key actions that together will enhance our ability to deliver on our clear and consistent strategy. First, we plan to divest 6 high-quality but noncore assets this year. From this point forward, our world-class portfolio will consist entirely of Tier 1 and emerging Tier 1 operations

> and districts. And it will have a significant exposure to growth in copper and gold from our industry-leading organic project pipeline.
>
> Second, we provided today our 2024 and 5-year outlook, giving a clear picture of the work we are doing to expand margins and appropriately sequence our projects to deliver sustainable value.
>
> Third, with the clarity, simplicity and focus that our Tier 1 portfolio provides, we have committed to deliver a further $500 million in cost and productivity improvements across the entire portfolio. And these improvements are over and above our synergy commitment from the Newcrest acquisition. We expect to hit this $500 million annual run rate of improvement by the end of 2025. And finally, we announced a balanced shareholder return framework, consisting of a $1 per share annualized base dividend and a new $1 billion share repurchase program.

101. Defendant Palmer continued, discussing how the Company aims to continue moving forward, stating:

> Our go-forward Newmont portfolio is focused on Tier 1 gold and copper operations and projects located in the world's most favorable mining jurisdictions. It has 4 key features. First, it contains 10 Tier 1 operations, representing more than half of the world's Tier 1 gold mines. Second, it has 3 emerging Tier 1 operations with a clear path for growth, along with the opportunity to create a Tier 1 district in British Columbia, a district in which Newmont will be operating for at least the next century. Third, it has an unmatched organic development pipeline with 6 large-scale copper-gold projects. And fourth, underpinning our Tier 1 portfolio is the industry's most robust foundation of reserves and resources.
>
> Going forward, Newmont has the industry's largest gold resource base, and we also have the largest base of copper resource in the gold industry. And to put that into perspective, Newmont has an almost 30% larger gold reserve resource base than our nearest peer, and a 40% larger copper reserve resource base than our nearest gold peer. No other gold producer in the world can offer the depth and quality that Newmont's Tier 1 portfolio can today.

102. Later on during his scripted remarks, Defendant Palmer reiterated the improvements made to the Tier 1 portfolio, stating:

> ***As I mentioned earlier, with a clear line of sight into our -- into the Tier 1 managed operations in our portfolio, we have identified $500 million of additional cost and productivity improvements over and above our synergy commitments***. So taking everything into account, over the next 5 years, we expect to deliver growing gold production driven by the completion of laybacks at both Boddington and Penasquito, the new ounces from Ahafo North, the completion of

> the second expansion at Tanami, at both block caves at Cadia, and mining improvements combined with higher grades at Lihir. And on top of this improving gold production, Newmont will produce a significant amount of copper along with silver, lead, zinc and molybdenum from a global, diversified Tier 1 portfolio.
>
> ***Driven by this higher metal production and with a focus on improving costs, we expect to deliver lower all-in sustaining costs, bringing our go-forward portfolio down to around $1,150 per ounce by 2027.***

(Emphasis added).

103. Defendant Palmer went on to summarize how the Tier 1 assets would help the Company, stating:

> Newmont's go-forward portfolio sets the new standard for gold and copper mining and provides our shareholders with exposure to the highest concentration of Tier 1 assets in the sector, located in the most favorable mining jurisdictions and with an improving cost profile to maximize margins and generate strong free cash flow. We provide industry-leading growth optionality in copper and gold through disciplined reinvestment and project execution and provide a balanced shareholder return framework.

104. During the scripted remarks on the FY 2023 Earnings Call, Defendant Viljoen discussed the Company's recently restructured project delivery team and how that would impact the Company's guidance, stating:

> ***This team of subject matter experts is working across the full spectrum of our organic pipeline, including studies, project development, construction and commissioning of projects, by strength in our operating model with block driving capability and an understanding of industry-leading practices in project development***.
>
> This year, we will have a laser focus on the performance of our 11 managed operations in our go-forward portfolio, while also guiding our 6 noncore assets through a safe and productive process for divestment. ***As we work to deliver efficiency and reliability from our global portfolio, we are committed to progressing our 4 key projects in execution and keeping them on track in 2024***.

(Emphasis added).

105. During the question-and-answer portion of the FY 2023 Earnings Call, Defendant Palmer was asked about what was considered when preparing the five-year guidance, with Defendant Palmer replying:

> *Levi Spry – UBS Investment Bank*: I just had a question around the 5-year guidance. Just trying to understand what was in there, what wasn't, and I guess what could change, specifically thinking about some of the projects that you called out on one of the other slides. Can you sort of just walk us through what is in the, I guess, development capital in 2027, '28 versus the studies?
>
> *Defendant Palmer*: What you're seeing in the production and cost profile is just that go-forward Tier 1 portfolio. So it does not include the 6 asset sales for divestment. It does include the ounces to start to come through from the investments that we're making in those 4 projects that we talked about. So it's seeing ounces come through in that time frame from the 2 block caves at Cadia, shaft at Tanami and Ahafo North. And a significant proportion of that $1.3 billion of development capital in that time frame is about funding those 4 projects in execution.
>
> As we think towards the end of that 5 years, we certainly started to see the spend on those projects drop off. It's going to be around about that time frame that we're starting to think about what's that next cab off the rank in terms of projects that would maintain that average of $1.3 billion. But the vast majority of what you see in that 5-year profile, particularly the cost profile, the all-in sustaining cost profile and the gold production profile is the existing operations moving through different stages of the mine cycle. We're getting to higher grades and that investment paying off in terms of additional ounces and better grades.

***2024 Proxy Statement***

106. On March 11, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, and Story solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

107. The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, and Story to the Board; (2) approve executive compensation, on an

advisory basis; and (3) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

108. With respect to the Company's Code of Conduct, the 2024 Proxy Statement stated:

> Newmont's Code of Conduct (the "Code") publicly sets out the high standards of conduct expected of all of our Directors, employees and officers including the Chief Executive Officer, the Chief Financial Officer, the Chief Accounting Officer and other persons performing financial reporting functions, as well as by our partners, vendors and contractors when they are working with us or on our behalf. The Code, which has been adopted by Newmont's Board of Directors, sets out Newmont's basic standards for ethical and legal behavior. The Code is available on our website at http://www.newmont.com/about-us/governance-and-ethics/. The Code is designed to deter wrongdoing and promote: (a) honest and ethical conduct; (b) full, fair, accurate, timely and understandable disclosures; (c) compliance with laws, rules and regulations; (d) prompt internal reporting of Code violations; and (e) accountability for adherence to the Code. Newmont will post on its website a description of any amendment to the Code and any waiver, including any implicit waiver, by Newmont of a provision of the Code to a Director or executive officer (including senior financial officers), the name of the person to whom the waiver was granted and the date of the waiver within four business days of such waiver or amendment. We granted no waivers under the Code in 2023.

109. In a section titled "Board Oversight of Risk Management," the 2024 Proxy Statement stated the following about the Board's risk oversight responsibilities, in relevant part:

> As noted in our Corporate Governance Guidelines, one of the primary responsibilities of the Board is to assess major risks facing the Company and review options for their mitigation in order to create long-term value for shareholders and other stakeholders. The Board has the opportunity to address key risks at each Board meeting in connection with its regular review of strategy, significant operational, financial and business developments. The Board reviews risks arising out of specific significant transactions when these transactions are presented to the Board for review or approval. Significant operational risks that relate to ongoing business operations are the subject of regularly scheduled reports to either the full Board or one of its committees. Each of the Board's committees address risks that fall within the committee's areas of responsibility as outlined above. The operational risks periodically reviewed by committees are also reviewed by the entire Board when a committee or the Board determines this is appropriate. The independent Chair promotes effective communication and consideration of matters presenting significant risks to the Company by developing the Board's meeting agendas, advising committee chairs, chairing meetings of the Board and facilitating communications between independent Directors and the Chief Executive Officer including in executive sessions.

> Oversight of the Company's long-term strategy and business plan is a key priority for the Board of Directors. The Board holds an annual multi-day session for a strategy deep-dive. The Directors work closely with the Executive Leadership Team to review and collaborate on the strategy and the potential risks and opportunities of the business. In addition, the CEO and Executive Leadership Team provide updates on the Company's strategy, competitive landscape and key issues during at least each quarterly Board meeting. The Chair also allocates significant time on the meeting agenda for discussion and reflections. This is done to ensure that strategic oversight remains a dynamic and on-going collaboration, which drives accountability and provides management with insights from our Board on a regular basis as they execute on the Company's strategy.

110. Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, and Story caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's Tier 1 operations facilities did not see the mining and cost profile improvements expected; (2) as such, the Company did not have reliable information to be able to accurately predict its gold and mineral production levels; (3) as a result, the Company's revenue projections were not based upon reliable information; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

111. The 2024 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

112. As a result of Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, and Story causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Palmer, Aiken,

Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, and Story to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve executive compensation, on an advisory basis; and (3) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

***April 25, 2024 Press Release***

113. On April 25, 2024, the Company issued a press release announcing the financial and operational results for the first quarter of the 2024 Fiscal Year (the "Q1 2024 Earnings Release"). The Q1 2024 Earnings Release revealed that the Company was "firmly on track to deliver 2024 guidance for production, costs and capital spend; full-year production expected to be second-half weighted as previously indicated."

114. The Q1 2024 Earnings Release also quoted Defendant Palmer, who highlighted the Company's performance in the first quarter while attributing the results to the Company's Tier 1 operation, stating:

> Newmont delivered a strong first quarter operational performance, producing 2.2 million gold equivalent ounces and generating over $1.4 billion in cash from operations before working capital changes…Underpinned by the gold industry's leading portfolio of Tier 1 gold and copper operations, we remain well-positioned to achieve our full-year guidance and deliver meaningful synergies and productivity improvements from the combined portfolio. We remain focused on delivering on the commitments we laid out at the beginning of this year, creating an attractive value proposition for new and existing investors during this unique time in the gold industry.

***April 25, 2024 Earnings Call***

115. That same day, the Company hosted an earnings call with investors and analysts to discuss the first quarter results (the "Q1 2024 Earnings Call"). During his scripted remarks on the

Q1 2024 Earnings Call, Defendant Palmer announced that the Company is on track to deliver on its 2024 guidance, stating:

> We are firmly on track to deliver our 2024 guidance. We are pleased with our operational performance in the first quarter and remain focused on delivering consistent results as guided over the remainder of this year and beyond. I also want to reiterate the 4 key commitments that we have made to our shareholders. We continue to make progress on these commitments, and I'd like to provide a brief update on our first quarter achievements.
>
> Starting, we're strengthening Newmont's position as the gold industry's recognized sustainability leader. Last week, Newmont published their 20th Annual Sustainability Report along with our third annual taxes and royalties contribution report, both providing a detailed and transparent look at our values-driven approach to sustainability, and the economic contributions we made in the jurisdictions and communities that we operate in. With this sustainable foundation in place, we have created the industry's strongest portfolio of world-class gold and copper assets in the most favorable mining jurisdictions.

116. Defendant Palmer continued by highlighting the Company's portfolio, stating:

> ***And from this portfolio, we produced 1.7 million ounces of gold at an all-in sustaining cost of $1,439 an ounce in the first quarter. We continue to expect these unit costs to improve throughout the year driven by both higher production in the second half and the delivery of synergies. I'd also note that in the first quarter, our go-forward Tier 1 portfolio produced 1.4 million ounces of gold at $1,378 an ounce***.
>
> Our Tier 1 portfolio also produced over 480,000 gold equivalent ounces from copper, silver, lead and zinc and included in this number is the 35,000 tonnes of copper that we produced and sold. We generated $776 million of cash flow from operating activities in Q1, including a $666 million reduction from working capital which Karyn will cover in a few minutes.
>
> And when we exclude the $291 million onetime stamp duty payment we made in February in connection with our acquisition of Newcrest free cash flow for the quarter would have been $217 million. ***Our second quarter production and costs are expected to remain relatively consistent with the first quarter. And we continue to expect that our gold production will be weighted to around 53% in the second half of the year, remaining firmly on track to achieve our full year guidance on both production and cost basis***.

(Emphasis added).

117. Later in his scripted remarks, Defendant Palmer went on to discuss the initiatives the Company has undertaken to maintain its guidance, stating:

> And finally, turning to synergies. We remain firmly on track to deliver on our commitments. In the first quarter, we achieved $56 million in synergies, bringing the total delivered to $105 million since we closed our acquisition of Newcrest in November last year and building solid momentum towards our commitment of delivering a $500 million synergy run rate by the first of January 2026.
>
> ***We have identified a series of initiatives, each with action plans and dedicated resources in place that have us on track to achieve a $335 million run rate by the end of this year, representing 2/3 of our $500 million synergy commitment and well ahead of the run rate we estimated when we announced this commitment in May of last year. Beginning with the core of this value delivery, we are seeing great opportunities emerging from our full potential work and we are just getting started.***
>
> At Lihir, we recently completed the first phase of full potential from which we have identified initiatives that will deliver more than $150 million of value close to double the synergy target we allocated to this new Tier 1 operation in our portfolio. I've just returned from Lihir and the key to extracting this value will be simplification. Following a very similar approach to the 1 we used at Penasquito 5 years ago. We have key members of our Newmont technical team on the ground in P&G supporting the site team to work on simplifying operations by focusing on the areas that would genuinely move the needle and stopping the non-value activities that have historically played this operation.

(Emphasis added).

118. Lastly, in discussing the Company's synergies, Defendant Palmer stated:

> ***Then turning to G&A. We have already achieved over 80% of the synergies that we committed to and we expect to exceed our $100 million G&A commitment by the end of this year. Most of our G&A synergies are coming from employee and contractor rationalization as we expected and to a lesser extent, from reductions in insurance premiums and other administrative fees. We look forward to realizing the significant production and cost benefits from our synergy work and we will continue to provide you with updates on our progress each quarter.***

(Emphasis added).

119. During her scripted remarks, Defendant Ovelmen highlighted the Company's production and set out expectations for a strong second half of 2024, stating:

> And with production also weighted toward the second half of the year, we anticipate that the majority of our cash flow after working capital will be realized in the third and fourth quarter, positioning Newmont for a stronger second half of the year from both an earnings and cash flow perspective as we continue to focus on operational delivery. As Tom mentioned, we remain firmly on track to achieve our full year guidance for production, costs and capital spend.
>
> Production is expected to increase in the second half of the year. With the year's strongest performance anticipated in the fourth quarter, primarily driven by strong grades at Penasquito, and Tanami. And unit costs will be closely correlated to production with the added benefit of full potential improvements and additional synergies realized in the second half of the year.

***July 24, 2024 Press Release***

120. On July 24, 2024, the Company issued a press release announcing its financial and operational results for the second quarter of the 2024 Fiscal Year (the "Q2 2024 Earnings Release"). The Q2 2024 Earnings Release once again announced that the Company was "[o]n track to deliver 2024 guidance for production, costs and capital spend; anticipating a sequential increase in production in the second half of the year, weighted towards the fourth quarter."

121. The Q2 2024 Earnings Release also quoted Defendant Palmer, who highlighted the Company's production and free cash flow, stating:

> Newmont delivered a solid second quarter, producing 2.1 million gold equivalent ounces and generating $594 million in free cash flow…We continued to advance our divestiture program and, to date, have announced $527 million in proceeds this year. With this momentum, we completed $250 million in share repurchases and repaid $250 million in debt. As we head into the second half of the year, we remain confident in our ability to continue executing on shareholder returns, meet our full year guidance and deliver on our commitments.

***July 24, 2024 Earnings Call***

122. That same day, the Company hosted an earnings call with investors and analysts to discuss the second quarter results (the "Q2 2024 Earnings Call"). During his scripted remarks on the Q2 2024 Earnings Call, Defendant Palmer highlighted the Company's synergy delivery while discussing the results, stating:

> Turning now to synergies. We remain firmly on track to deliver above and beyond our initial commitment of $500 million. In the second quarter, we achieved $100 million in synergies, bringing our run rate to $205 million since we closed our acquisition of New Crest only 8 months ago. With this solid momentum, we have now disbanded our back-office integration team and remain firmly on track to achieve a $335 million run rate by the end of this year, well ahead of our initial estimates.
>
> ***Looking at the 3 components of our synergy delivery, and starting with full potential. We are now advancing into the delivery stage of the initiatives we have identified at Lihir, Cadia and Red Chris, with the largest value drivers coming from our 2 new Tier 1 assets in Lihir and Cadia. On our call last quarter, we provided an update on the opportunities we have identified at Lihir. In this quarter, I'll briefly describe some of the opportunities we see in front of us at Cadia. We recently completed our full potential diagnosis phase at Cadia, from which we have identified a series of initiatives that are expected to deliver more than $100 million of value by the end of next year.***

(Emphasis added).

123. Defendant Palmer continued with his scripted remarks, discussing how the Company has aimed to increase production while improving cash flows, stating:

> During this first phase, we had a team of experts from Newmont's Global Technical Services group working to support the site to identify opportunities to higher production and improve cash flows. As one example of this, and through collaboration with Boddington, Cadia is working to optimize the output from its high-pressure riding roll circuit in the mill. With these HPGR improvements, Cadia will be able to lift its mill feed by approximately 80 tonnes an hour or more than 600,000 tonnes a year, implementing the initiatives we have identified and leveraging the experience we have gained over the last 10 years with our Full Potential program.
>
> We are working with the team at Cadia to increase average mill throughput to 34 million tonnes per annum representing a meaningful step up in productivity from this world-class gold and copper asset. With Lihir, Cadia and Red Chris all now entering the delivery phase of full potential, we are on track to meet our initial $200 million commitment.

124. Turning to the Company's supply chain and G&A synergies, Defendant Palmer stated:

> Turning to supply chain synergies. We continue to leverage our combined scale to drive improved commercial outcomes for both pricing and terms. In the second

> quarter, we realized $60 million in synergies from around 40 initiatives in contracted services, mining equipment, energy, information technology among other categories. And we have a clear line of sight to reach $140 million run rate by the end of this year as we progress our commercial work across several spend categories, including chemicals, explosives, grinding media, ties, fuel, as well as spare parts and rotables.
>
> ***And finally, turning to G&A synergies. We have now achieved 95% of our initial $100 million commitment with an additional $15 million realized during the second quarter. The latest G&A synergies have primarily been coming from continued labor rationalization and ongoing reductions in our contractor spend. Taking these synergies into account, combined with the higher production volumes anticipated in the second half of this year, we expect to deliver lower unit costs in the third and fourth quarters.***

(Emphasis added).

125. During her own scripted remarks on the Q2 2024 Earnings Call, Defendant Ovelmen discussed the Company's track to hit its guidance while reducing costs, stating:

> And whilst we are pleased with the improvement in free cash flow, we are still not satisfied and are working to further improve margins. Looking ahead, we anticipate higher free cash flows in the second half of the year driven by increased production values and lower unit costs, as Tom and Natascha just mentioned. ***Heading into the second half of the year, we remain firmly on track to achieve our full year guidance of reduction, cost and capital spend***. And as Natascha mentioned, production is expected to increase in the third quarter with the year's strongest performance anticipated in the fourth quarter.
>
> Unit cost will be closely correlated to production with the added benefit of full potential improvements and additional synergies realized in the latter part of the year. Today, we announced 2 divestments, including the monetization of our Batu Hijau deferred payment obligations and the sale of our Lundin Gold financing facilities. In total, these divestitures are expected to generate nearly $530 million in gross proceeds by the end of the year. ***With this momentum, the benefit of higher commodity prices contributing to enhanced free cash flows and the confidence in our asset divestiture program, we were able to prioritize shareholder returns sooner than anticipated while concurrently executing on debt reductions***.

(Emphasis added).

126. Later in the call, Defendant Palmer highlighted the Company's high production and low costs entering the second half of the year, stating:

> First and most importantly, we commenced a systematic review of our safety and risk management systems. We safely delivered solid production as planned, keeping us firmly on track to meet our full year guidance for both ounces and costs. We announced meaningful progress on our portfolio optimization commitments with the monetization of our Batu Hijau deferred payment obligations. We realized $100 million in synergies, bringing the total delivered to $205 million since we closed our acquisition of Newcrest in November last year. We've demonstrated our commitment to shareholder returns, delivering $540 million through both regular dividends and share repurchases. And we strengthened our balance sheet with $250 million of debt reduction.
>
> As we enter the second half of this year, I am confident in our ability to deliver high production, more potential improvements and additional synergies, all of which will contribute to lower unit costs in the third and fourth quarters, and execute on our portfolio optimization strategy through the divestment of our noncore assets, and to progress our capital allocation priorities, all positioning Newmont for a strong finish to this year.

(Emphasis added).

127. During the question-and-answer portion of the Q2 2024 Earnings Call, Defendant Palmer fielded a number of questions regarding the Company's expected production and cost decreases during the fourth quarter. For example, in response to one question from a Scotiabank analyst regarding the Company's synergies in the third quarter heading into the fourth quarter, Defendant Palmer replied:

> *Tanya M. Jakusconek – Scotiabank*: As I think about the second half, and I think you mentioned that there will be a step-up in production to volume and then stronger volumes in Q4, I think about this cost structure because in order for us to get these costs down, we do need the volume, number one. And obviously, the $130 million in synergies that you mentioned. I'm just trying to picture for myself, should I be thinking that the step-up into Q3 like almost like 26% of production coming out of the year and then 28% in Q4 and $130 million, majority of those savings coming in Q4? I'm just trying to understand how I'm going to get to your guidance on the costing side with the volume and the synergies and also where the $130 million in synergies are coming from, if I can have a breakdown of those.
>
> *Defendant Palmer*: You certainly got to see the synergies getting through -- particularly those coming from full potential in the fourth quarter as those programs get their momentum up. You're certainly going to see the highest quarter 4 gold ounces in the fourth quarter. That's from some of our key assets that Natascha

covered in her comments. The 2 non-managed joint ventures, so NGM need to deliver on their commitments and they've got that strong fourth quarter.

128. In a follow-up question from the same analyst regarding where the synergies are coming from, Defendant Palmer responded:

> *Jakusconek*: And maybe just if I could have an understanding. Maybe just an understanding of the $130 million in synergies. Can you just give me a breakdown of what's coming from? Is it like what very little is left in G&A? Is it supply chain like $3 million of it and $100 million in the operations? I'm just trying to understand how I should think about that $130 million coming in yet.
>
> *Defendant Palmer*: Yes. Certainly, when you think about G&A, and it's the same we saw for Goldcorp, similar size companies, that's around about the mark. So we've largely seen that come through. Still pushing hard on -- we've got a strong commercial team working hard on all those fronts. So you're going to see a good amount come from that supply chain work. And then you'll start to see both Lihir and Cadia bit of regress in the fourth quarter. So not much from G&A to percentage coming from supply chain as that work started to kick in. And then you'll start to see in the fourth quarter some of the full potential of the operation starting to kick through, really, they start to show up in 2025. But again, the split, you're actually [indiscernible] not too far off the mark.
>
> ***Our direct costs are pretty stable across the year. And certainly what we're seeing in the first half flowing through the second half, pretty stable. So I think the picture you're painting in terms of that third quarter weighting to the fourth quarter weighting is a reasonable position to be thinking about in terms of that weight between the third and the fourth quarter. You will see a step up in the third and then a step up into the fourth to get to our numbers.***

(Emphasis added).

129. Lastly, in response to a question from a Jeffries analyst regarding whether the Company expects an increase in CapEx down the line, Defendant Palmer responded:

> *Matthew Murphy – Jeffries LLC*: And then maybe just as a follow-on on the CapEx question. Do you view an increase in CapEx down the line? Is that kind of like a time line related thing where you integrate Newcrest for a number of years and kind of focus on capital returns and then eventually get back into potentially higher development CapEx?
>
> *Defendant Palmer*: No, Matt. We've been clear in our strategy. We have built a portfolio of Tier 1 long-life assets, [indiscernible] managed operations and non-managed joint ventures, something that hasn't been seen before in the gold industry.

> I think for the first time, we have a long life, very long-life gold mining business with Tier 1 assets.
>
> Key to running a long-life portfolio is our discipline around capital allocation. So if we think about this portfolio going forward and our pipeline of projects, the 6 big projects sitting in our pipeline, our discipline around the amount of capital we'll put towards sustaining capital for that portfolio, and the $1.3 billion towards development capital doesn't change. It's the discipline around managing our long-life portfolio and having a view on capital that's like 2 decades out and thinking about what that means is key to what we've built.
>
> So we'll demonstrate that over time, but the expectation you should expect from us is that $1.3 billion is the amount of money that we allocate to reinvest back in the business each and every year.

***September 17, 2024 Denver Gold Forum***

130. On September 17, 2024, Defendants Ovelmen and Viljoen represented the Company during a presentation at the Denver Gold Forum. During the presentation, both Defendants Ovelmen and Viljoen repeatedly highlighted the Company's Tier 1 portfolio. For example, in response to a question about Defendant Viljoen's observations on the Company's growth, Defendant Viljoen replied:

> *Question*: So Natascha, I want to start with you. Building on your several decades of mining industry experience, your observations on Newmont so far from an operational excellence and growth point of view?
>
> *Defendant Viljoen*: If we consider the portfolio of assets we have today, it is a real suite of Tier 1 assets, with a total embarrassment of riches when we think about our project portfolio. The reality for us and the opportunity lies in operational excellence, technical expertise and the discipline to deliver against good, developed plans, with an eye on the future. And if you consider where we are in the gold industry and what the trajectory is that we see the gold sector will go into, continuously planning and designing our mines with a long-term in mind.
>
> And with 11 Tier 1 assets, soon to be 12 when we start up our Ahafo North project, we have a true opportunity to look at the enterprise and run these operations really, really well. And the one lesson I've learned, and is actually something that my father told me when I started my career, and when you talk about people like Mark and Amar in the room, is that we need to go back and learn what really good basic practice in mining is. We need to know our assets really well and we need to drive that basic good practice in mining.

131. In response to a question regarding the Company's current capital allocation strategy, Defendant Ovelmen responded:

> *Question*: …how would you describe Newmont's current capital allocation strategy? And what do you think Newmont can do better in terms of capital allocation?
>
> *Defendant Ovelmen*: So we own more than half of the world's Tier 1 gold mines. So we lead when it comes to scale, ounces, reserves, but coming from outside the industry, I think in terms of where we need to do better, we need to push beyond these types of metrics.
>
> The industry has not done very well when it comes to return on invested capital and [Technical Difficulty] returns through a cycle. I think it's an opportunity for us. We need to run our business well. We need to put out -- we need to meet our guidance every quarter, every month, every year. But most importantly, we -- from a capital allocation perspective, we need to put an economic lens in terms of how we want to run our portfolios, with an eye towards that return on invested capital, truly creating economic value for our shareholders.
>
> Natascha has a renewed focus in terms of safety, operational excellence, project execution. We also need to provide that economic lens on our portfolio. So how do we structure the portfolio, run the portfolio, make capital allocation decisions, whereby we are truly creating economic value for our shareholders in the near term and over the longer term?
>
> I think because of the Tier 1 portfolio that we have, because of that focus on operations and that renewed energy around that as well as really putting a true lens in terms of how we want to look at this portfolio in terms of the types of returns that we can provide to our shareholders over the near term and the long-term, we have a real opportunity, I believe, to differentiate in this space and to change that trajectory in terms of providing returns to shareholders.

132. In response to a question regarding the Company's recently acquired assets and the impact they are expected to have, Defendant Viljoen responded:

> *Question*: …having gone through the assets, what have you learned about the newly acquired assets, one? And second, what opportunities you see in terms of deploying the full potential program just by integrating those assets within Newmont?
>
> *Defendant Viljoen*: The flexibility that we can build in our operational performance and how we think about our sustaining capital profile and staging that to ensure that we have a stable ounce profile and a sustainable -- sustainable capital profile.

> When we consider the full potential program on the new assets, particularly, we've run all 4 assets that will remain in the portfolio now through our full potential program. And that is -- all of those are in execution at the moment. We have committed $200 million are as part of the synergies that will come from that process, and we're well on track.
>
> But I do want to emphasize that not only through the full potential program, but in stepping back and changing the constraints that we've put on our operations, the constraints that we've put on how we look at our portfolio of assets and how that enterprise have interdependency, ***it is an opportunity for us to make a real step change in productivity, bringing costs down to sustainable low cost base and working towards that economic margin expansion*** that Karyn has been talking about.

(Emphasis added).

133. In response to a question regarding the Company's top three priorities, Defendant Viljoen responded:

> *Question*: So if you look at your growth portfolio right now, what did you say are the 1, 2, 3 priorities for Newmont?
>
> *Defendant Viljoen*: Lastly, we've got this embarrassment of riches in terms of the broader portfolio. And Karyn and I partnered on this to say, "Well, we want to really make a step change in how we develop and deliver on large-scale projects." Financial evaluation is a really big portion of that development, but really understanding the technical detail and risk or opportunity on the delivery and execution of that projects is the focus. So as we step through this embarrassment of riches, not looking -- only looking at the financial returns, but our ability to committed to deliver and deliver against it. And then we will put that through our capital allocation framework.

134. The statements in ¶¶96-105, 113-133 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's Tier 1 operations facilities did not see the mining and cost profile improvements expected; (2) as such, the Company did not have reliable information to be able to accurately predict its gold and mineral production levels; (3) as a result, the Company's revenue projections were not based upon reliable information; and (4) the

Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

135. The truth emerged on October 23, 2024 when the Company published the Q3 2024 Earnings Release. The Q3 2024 Earnings Release revealed that the Company had a disappointing EBITDA in the third quarter of the 2024 Fiscal Year. The Q3 2024 Earnings Release also revealed that the Company was lowering its production guidance while raising its expected operating costs, stating in the Third Quarter 2024 Production and Financial Summary, *inter alia*:

> **Gold CAS** totaled $1.9 billion for the quarter. Gold CAS per ounce3 increased 5 percent to $1,207 per ounce compared to the prior quarter primarily due to higher direct costs at Lihir, as a result of planned autoclave maintenance, as well as higher direct operating costs primarily due to increased contract services across the portfolio.
>
> **Gold AISC** per ounce increased 3 percent to $1,611 per ounce compared to the prior quarter primarily due to higher CAS.
>
> * * *
>
> **CAS from other metals** totaled $418 million for the quarter. CAS per GEO3 increased 21 percent from the prior quarter to $1,015 per ounce due to higher costs allocated to co-products at Peñasquito, Cadia, and Red Chris, as well as the impact of the shutdown at Telfer due to the tailings remediation work.
>
> **AISC per GEO** increased 11 percent to $1,338 per ounce compared to the prior quarter primarily due to higher CAS from other metals, partially offset by lower treatment and refining costs.
>
> **Net income attributable to Newmont stockholders** was $922 million or $0.80 per diluted share, an increase of $69 million from the prior quarter primarily due to higher average realized gold prices and higher sales volumes, partially offset by higher unit costs of production, as well as a loss on assets held for sale of $115 million recognized in the third quarter compared to $246 million recognized in the second quarter of 2024.

136. Later that day, the Company held an earnings call to discuss the third quarter results (the "Q3 2024 Earnings Call"). On the Q3 2024 Earnings Call, Defendant Viljoen explained the

Company's lower production levels due to changes made in the Company's new operations, stating:

> As we look ahead to 2025, our operational focus at Lihir will remain on reducing complexity to deliver more sustainable and predictable results at this Tier 1 operation. ***In the short term, these efforts will result in lower than initially anticipated production next year due to lower throughput to allow for asset reliability improvement work and changes to the mine sequencing, including the establishment of wider ramps to manage surface water and repositioning all roads to be more effective and efficient***.
>
> Whilst we complete this work, we will be processing a higher proportion of lower grade stockpiles in 2025. And we anticipate that gold production next year from Lihir will be largely consistent with this year's and around 250,000 ounces lower than our initial guidance for 2025 that we provided back in February.

(Emphasis added).

137. Defendant Viljoen then continued, identifying that the changes made at the Company's Brucejack site faced similar issues:

> Similarly, at Brucejack, we have taken a step back this year to do the development and drilling work to ensure that we improve our knowledge of this nuggety ore body. We continue to experience periods of exceptional high grades, including a 1-day average of 52 grams per ton last month and an average of over 20 grams per ton in the same week. ***As a result of the work we are doing, we anticipate that the gold production next year from Brucejack will also be largely consistent with this year, all around 100,000 ounces lower than our initial guidance for 2025 that we provided back in February***.

(Emphasis added).

138. During his scripted portion of the Q3 2024 Earnings Call, Defendant Palmer discussed the Company's cost increases, stating:

> Looking ahead to 2025, we expect gold production from our goforward Tier 1 portfolio to remain largely consistent with this year, driven by the lower than previously expected production from two of our new operations in Lihir and Brucejack. We expect unit costs for our core portfolio in 2025 to align with the trends we are observing this year. We also remain committed to the critical tailings work in Cadia, which may result in an annual sustaining capital spend of around $1.8 billion from our core portfolio over the next few years.

> ***And we continue to see higher previously expected direct costs and G&A spend. But with the clarity of our go-forward portfolio, we are now working to manage. With this context, my leadership team and I have a laser focus on the work we need to do to optimize our go-forward portfolio of 11 managed operations and 3 projects in execution. Whilst we do anticipate production growth over time, our focus is firmly on expanding margins, generating a strong return on capital invested and creating value versus chasing volume. We are taking a critical look at our organic project pipeline and spending time to ensure that any reinvestment we make into our portfolio is both disciplined and deliberate.***

(Emphasis added).

139. During the question-and-answer portion of the Q3 2024 Earnings Call, analysts had a barrage of questions regarding the Company's sudden change in guidance. For example, in response to a UBS analyst's question regarding whether unit costs will moderate over time, Defendants Palmer and Ovelmen responded:

> *Daniel Edward Major – UBS Investment Bank*: But when I look back to February and you look at your cost profile in medium term, like many in the gold industry, you've got costs coming down over time over the next few years, yet this year, all-in sustaining costs are $100 higher than you saw in February. Is it realistic and credible to actually assume that unit costs will moderate over time? Or should we rather be assuming the best case outcome is limiting inflation?
>
> *Defendant Palmer*: Certainly, if I think about the gold industry, there's always been a strong correlation between gold price and the cost of producing an ounce of gold, given that inflation is one of those key structural elements behind the gold price. So as you look forward, if gold price eases, then you'd expect the cost of producing an ounce to ease. And obviously, you're going to see some tracking between the cost per ounce and the gold price. Our focus is on what we're putting in place is that we have 11 managed operations going forward where we're going to be in a position to be looking over the long term and strengthening and growing those margins.
>
> The other comment I'd make before I pass to Karyn, if you wanted to build on that, is when you look at the out-year numbers that we had provided back in February, that assumed 0 escalation. And so when you think about any forward-looking numbers, there's no escalation. And obviously, what we're seeing as we are closer to 2025, the run rates we're seeing as we close out this year and that is going to flow into next year as we understand the cost for the next 12 to 15 months.
>
> *Defendant Ovelmen*: Generally speaking, as we indicated, the cost that we're seeing here in 2024, we do expect those to trend into 2025. Costs were higher, driven by higher direct costs, primarily. If you think about contracted labor, which is 50% of

> our cost structure, we've seen those increase into the third quarter and through the year. And so we expect that, that's been built in now into our cost estimates as we head into 2025.

140. In response to a follow up question from the same analyst regarding what the new how the new results impact the guidance for 2025, Defendant Palmer responded:

> *Major*: Yes, just again, just thinking about your guidance comments for 2025. You previously looked at in February around 6 million ounces from the core portfolio in terms of gold. You highlight in the comments, 250,000 ounces lower than your previous plans at Lihir and 100 at Brucejack. So is it fair to then assume 350,000 off the 6 million is the new base when we look into 2025?
>
> *Defendant Palmer*: Certainly, the two movers in terms of our managed portfolio, and as I think as Natascha said in her remarks, and I followed up with the drivers behind that mine sequence at Lihir and getting in front of understanding the resource definition of Brucejack and the development work and the drilling you need to do for that. Both of those are progressing well, but it's the ounces for next year reflect that important work. I think the numbers, if you then look at the rest of the portfolio on those trends coming through from '24 flowing into '25 the number is more like 5.6 as you think about this portfolio for 2025, the core portfolio of the 2025. Obviously, we've got some divestments to close out and still got some more work to do on that front. Some of that will flow into 2025, as we complete that divestment work, but that core portfolio, 5.6% is about their gold production number for next year.

141. In response to a question from a RBC analyst regarding how analysts should be considering the changes in guidance, Defendants Palmer and Ovelmen responded:

> *Joshua Mark Wolfson – RBC Capital Markets*: I'm trying to wrap my head around the change -- the significant change in sort of cost expectations and to some degree, production expectations going forward versus what we had been hearing about previously. And I guess, there's sort of two different aspects, at least that I can understand. One is despite the synergy targets being achieved, it sounds like there's some larger integration issues, given the challenges or higher costs mentioned across Brucejack, Lihir and Cadia.
>
> And then on the other hand, we're hearing significant and unexpected inflation expectation changes, which I guess would be a larger industry-related item. I just want to sort of clarify how should we be thinking about these things? And am I sort of assessing this appropriately?
>
> *Defendant Palmer*: So maybe pick it up in a few parts. I think the commentary around Lihir, Cadia, Cerro Negro, I think you mentioned, is really the Q3 cost story.

So it's around Lihir, we had some costs that we had assumed would be in the fourth quarter for the large autoclave shutdown specialist labor in the remote part of the world moving into Q3. So that's one of the drivers there.

Cadia was power, where a higher power cost coming off our contract for price taker. Cerro Negro, it was more around ramping up following the tragedy earlier this year and making sure we're focused on doing that work safely, some productivity impacts. And then the other factor in the third quarter was we had some concentrate sales at Peñasquito didn't get away at the end of the third quarter due to some weather impacts there that obviously flowed into the fourth quarter.

So that's sort of bit of a ramp up of the third quarter cost story. When I look at '24 flowing into '25, so there's two impacts, the volume impact we just talked about with Dan and the Lihir and Brucejack work next year linked to that. And then the cost impact is sustaining capital and particularly around the work we're putting into the tailings facilities at Cadia. Cadia has got a 30-plus year life, several Panel Caves from come on. And there's work we need to do to ensure that Telfer capacity is matched to the volumes coming out of those Panel Caves. So that story is around volume for those couple of key drivers and then sustaining capital.

*Defendant Ovelmen*: Sure. Just a little more granularity in terms of 2024. So about 1/3 of that is increased due to that lower sales volume, including impacts from Telfer, Lihir and Brucejack. Another 1/3 relates to that higher sustaining capital that we've been talking about largely driven by Nevada. And then the remaining 1/3, half of that is by royalties due to higher gold price and half associated with the G&A. So our run rate synergies are driven by the targeted benefits at Cadia, Red Chris and Lihir. However, we've also had performance challenges within the business, including the Telfer tailings as well as the nonmanagement of underperformed expectations. But -- and I think further to that supply chain, G&A benefits have been impacted by our need to invest in the future of this combined Tier 1 portfolio with a key focus in areas with the integration from Newcrest to new mines as needed. But we're not happy with where we're at, and we're working to reduce these costs.

142. In response to a question regarding how much of the Company's synergy flows through OpEx, Defendant Palmer responded:

*Michael Parkin – National Bank Financial, Inc.*: Congrats on getting the synergy target achieved. Of the $500 million, how much of that flows through OpEx?

*Defendant Palmer*: Yes, obviously, the G&A component of that is part of your OpEx. The supply chain is a combination between improving costs and opportunity to get to productivity and volume. A lot of the full potential work is around volume. So you get some more productivity with current gold price, you get that benefit flowing through. So probably of the amount of that delivery, it's probably less than

half has come from that an operational exit the soft improvements as opposed to the productivity and volume improvements and the free cash flow that you get coming through. And if I look through that, if I look at where we sit is one of the earlier questions, as we're closing out the integration and the important part of closing out the integration is completing our divestments and having a clear line of sight to 11 managed operations, 3 projects in execution.

***I'm not happy with the G&A that we have that go-forward business. And that's an area that we're going to be focusing on to get that number down to match the go-forward business. And that's a little bit of that higher cost to carry as you work through that transition. But as we get that clarity on the remaining divestments going out the door, we need to ensure that our G&A is matching the size of the go-forward business and expect to see some -- we'll be working hard to get some improvement in that area in the months ahead***.

143. On this news, the price of the Company's stock fell $8.49 per share, or approximately 14.7%, from a close of $57.74 per share on October 23, 2024, to close at $49.25 per share on October 24, 2024.

**REPURCHASES DURING THE RELEVANT PERIOD**

144. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $197.7 million to repurchase approximately 3,782,250 shares of its own common stock at artificially inflated prices from August 2024 and September 2024.

145. According to the Form 10-Q the Company filed with the SEC on October 24, 2024 for the quarterly period ended September 30, 2024 (the "3Q 2024 10-Q"), between August 1, 2024 and August 31, 2024, the Company repurchased 1,526,190 shares of its own common stock at an average price per share of approximately $51.04, for a total cost to the company of approximately $77,896,738.

146. As the Company's stock was actually worth only $49.25 per share, the price at closing on October 23, 2024, the Company overpaid by approximately $2,731,880 for repurchases of its own stock between August 1, 2024 and August 31, 2024.

147. According to the 3Q 2024 10-Q, between September 1, 2024 and September 30, 2024, the Company repurchased 2,256,060 shares of its own common stock at an average price per share of approximately $53.09, for a total cost to the Company of approximately $119,774,225.

148. As the Company's stock was actually worth only $49.25 per share, the price at closing on October 23, 2024, the Company overpaid by approximately $8,663,270 for repurchases of its own stock between September 1, 2024 and September 30, 2024.

149. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $11.4 million.

**DAMAGES TO NEWMONT**

150. As a direct and proximate result of the Individual Defendants' conduct, Newmont has lost and expended, and will lose and expend, many millions of dollars.

151. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

152. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

153. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken

against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

154. Such losses include the Company's overpayment of approximately $11.4 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

155. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

156. As a direct and proximate result of the Individual Defendants' conduct, Newmont has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

157. Plaintiff brings this action derivatively and for the benefit of Newmont to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Newmont, waste of corporate assets, unjust enrichment, gross mismanagement, abuse of control, and violations of the Exchange Act.

158. Newmont is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

159. Plaintiff is, and has continuously been at all relevant times, a shareholder of Newmont. Plaintiff will adequately and fairly represent the interests of Newmont in enforcing and

prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

160. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

161. A pre-suit demand on the Board of Newmont is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following thirteen individuals: Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, and Story (the "Director-Defendants"), and non-party Harry M. Conger IV (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to seven of the thirteen Directors that were on the Board at the time this action was commenced.

162. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

163. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing,

the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

164. Additional reasons that demand on Defendant Palmer is futile follow. Defendant Palmer has served as the Company's President, CEO and as a Company director since October 2019. He has served various roles within the Company since May 2016, most recently as the Company's President. The Company provides Defendant Palmer with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As CEO, Defendant Palmer was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including those which he personally made. In addition, he solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, Story, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. As the Company's highest officer and as a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Palmer is a defendant in the Securities Class Action. Additionally, Defendant Palmer's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. For these reasons, too, Defendant Palmer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165. Additional reasons that demand on Defendant Aiken is futile follow. Defendant Aiken has served as a Company director since November 2023. He also serves as a member of the Compensation Committee. The Company provides Defendant Aiken with handsome compensation for his role as a director. In addition, he solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Palmer, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, Story, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Aiken breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166. Defendant Boyce has served as a Company director since October 2015, and as the Independent Chair of the Board since 2021. He also serves the Chair of the Corporate Governance and Nominating Committee, the Chair of the Executive-Finance Committee, and a member of the Compensation Committee. The Company provides Defendant Boyce with handsome compensation for his role as a director. In addition, he solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Palmer, Aiken, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, Story, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously

disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Boyce breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167. Additional reasons that demand on Defendant Brook is futile follow. Defendant Brook has served as a Company director since October 2011. He also serves as the Chair of the Audit Committee and as a member of the Corporate Governance and Nominating Committee and the Executive-Finance Committee. The Company provides Defendant Brook with handsome compensation for his role as a director. In addition, he solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Palmer, Aiken, Boyce, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, Story, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Brook breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168. Additional reasons that demand on Defendant Clark is futile follow. Defendant Clark has served as a Company director since April 2020. She also serves as a member of the Compensation Committee. The Company provides Defendant Clark with handsome compensation for her role as a director. In addition, she solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Palmer,

Aiken, Boyce, Brook, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, Story, and herself to the Board, allowing them to continue to breach their fiduciary duties to the Company. As a trusted long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Clark breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

169. Additional reasons that demand on Defendant Fitzgerald is futile follow. Defendant Fitzgerald has served as a Company director since December 2021. She also serves as a member of the Safety and Sustainability Committee. The Company provides Defendant Fitzgerald with handsome compensation for her role as a director. In addition, she solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Palmer, Aiken, Boyce, Brook, Clark, Layman, Madero, Médori, Nelson, Quintana, Story, and herself to the Board, allowing them to continue to breach their fiduciary duties to the Company. As a trusted long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Fitzgerald breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

170. Additional reasons that demand on Defendant Layman is futile follow. Defendant Layman has served as a Company director since November 2023. She also serves as a member of the Safety and Sustainability Committee. The Company provides Defendant Layman with handsome compensation for her role as a director. In addition, she solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Madero, Médori, Nelson, Quintana, Story, and herself to the Board, allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Layman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

171. Additional reasons that demand on Defendant Madero is futile follow. Defendant Madero has served as a Company director since April 2021. He also serves as a member of the Safety and Sustainability Committee. The Company provides Defendant Madero with handsome compensation for his role as a director. In addition, he solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Médori, Nelson, Quintana, Story, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and

consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Madero breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172. Additional reasons that demand on Defendant Médori is futile follow. Defendant Médori has served as a Company director since April 2018. He also serves as a member of the Audit Committee. The Company provides Defendant Médori with handsome compensation for his role as a director. In addition, he solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Nelson, Quintana, Story, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Médori breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173. Additional reasons that demand on Defendant Nelson is futile follow. Defendant Nelson has served as a Company director since October 2011. She also serves as Chair of the Safety and Sustainability Committee and as a member of the Corporate Governance and Nominating Committee. The Company provides Defendant Nelson with handsome compensation for her role as a director. In addition, she solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Quintana, Story, and herself

to the Board, allowing them to continue to breach their fiduciary duties to the Company. As a trusted long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Nelson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

174. Additional reasons that demand on Defendant Quintana is futile follow. Defendant Quintana has served as a Company director since October 2015. He also serves as Chair of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee. The Company provides Defendant Quintana with handsome compensation for his role as a director. In addition, he solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Story, and himself to the Board, allowing them to continue to breach their fiduciary duties to the Company. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Quintana breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175. Additional reasons that demand on Defendant Story is futile follow. Defendant Story has served as a Company director since September 2020. She also serves as a member of the

Audit Committee. The Company provides Defendant Story with handsome compensation for her role as a director. In addition, she solicited the 2024 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, and herself to the Board, allowing them to continue to breach their fiduciary duties to the Company. As a trusted long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Story breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

176. Additional reasons that demand on the Board is futile follow.

177. Defendants Brook (as Chair), Médori, and Story (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and

the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

178. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

179. Newmont has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Newmont any part of the damages Newmont suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

180. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable

of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

181. The acts complained of herein constitute violations of fiduciary duties owed by Newmont's officers and directors, and these acts are incapable of ratification.

182. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Newmont. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Newmont, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

183. If there is no directors' and officers' liability insurance, then the Directors will not cause Newmont to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

184. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

185. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

187. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

188. Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, and Story caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's Tier 1 operations facilities did not see the mining and cost profile improvements expected; (2) as such, the Company did not have reliable information to be able to accurately predict its gold and mineral production levels; (3) as a result, the Company's revenue projections were not based upon reliable information; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

189. The 2024 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

190. As a result of Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, and Story causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Palmer, Aiken, Boyce, Brook, Clark, Fitzgerald, Layman, Madero, Médori, Nelson, Quintana, and Story to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve executive compensation; and (3) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

191. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

192. Plaintiff, on behalf of Newmont, has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

193. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Newmont. Not only is Newmont now defending claims that it violated

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Newmont by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase ***3,782,250*** of its own shares at artificially inflated prices, damaging Newmont.

195. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

196. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Newmont not misleading.

197. The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

198. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**THIRD CLAIM**
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

199. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200. The Individual Defendants, by virtue of their positions with Newmont and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Newmont and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Newmont to engage in the illegal conduct and practices complained of herein.

201. Plaintiff, on behalf of Newmont, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

202. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Newmont's business and affairs.

204. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

205. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Newmont.

206. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

207. In further breach of their fiduciary duties owed to Newmont, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's Tier 1 operations facilities did not see the mining and cost profile improvements expected; (2) as such, the Company did not have reliable information to be able to accurately predict its gold and mineral production levels; (3) as a result, the Company's revenue projections were not based upon reliable information; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

208. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

209. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while Defendant Palmer engaged in lucrative insider sales, netting proceeds of approximately $3.1 million.

210. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

211. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

212. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

213. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Newmont has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214. Plaintiff, on behalf of Newmont, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

215. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Newmont, for which they are legally responsible.

217. As a direct and proximate result of the Individual Defendants' abuse of control, Newmont has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

218. Plaintiff, on behalf of Newmont, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

219. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

220. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Newmont.

221. The Individual Defendants either benefitted financially from the improper conduct or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

222. Plaintiff, as a shareholder and a representative of Newmont, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

223. Plaintiff, on behalf of Newmont, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

224. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

225. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Newmont in a manner consistent with the operations of a publicly held corporation.

226. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Newmont has sustained and will continue to sustain significant damages.

227. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

228. Plaintiff, on behalf of Newmont, has no adequate remedy at law.

**EIGHTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

229. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

231. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

232. Plaintiff, on behalf of Newmont, has no adequate remedy at law.

**NINTH CLAIM**

**Against Defendants Palmer, Viljoen, Ovelmen for Contribution Under Sections 10(b) and 21D of the Exchange Act**

233. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

234. Newmont, along with Defendants Palmer, Viljoen, and Ovelmen, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Palmer's, Viljoen's, and Ovelmen's willful and/or reckless violations of their obligations as officers and/or directors of Newmont.

235. Defendants Palmer, Viljoen, and Ovelmen, because of their positions of control and authority as officers and/or directors of Newmont, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Newmont, including the wrongful acts complained of herein and in the Securities Class Action.

236. Accordingly, Defendants Palmer, Viljoen, and Ovelmen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange

Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

237. As such, Newmont is entitled to receive all appropriate contribution or indemnification from Defendants Palmer, Viljoen, and Ovelmen.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Newmont, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Newmont;

(c) Determining and awarding to Newmont the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Newmont and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Newmont and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Newmont to nominate at least seven candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Newmont restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 21, 2025

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Docusign Envelope ID: 78FBE012-604C-4205-BF87-153ED2D3D4A7

**VERIFICATION**

I, Tyler Gunderson, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21 day of February, 2025.

DocuSigned by:
3CF53FE410CE4FE...
Tyler Gunderson